**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 18, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

MARY D. STOKES,

Plaintiff-Appellant,

v.

MICHAEL J. ASTRUE,
Commissioner, Social Security
Administration,

Defendant-Appellee.

No. 07-5046
(D.C. No. 05-CV-539-FHM)
(N.D. Okla.)

### ORDER AND JUDGMENT[*]

Before **HARTZ**, Circuit Judge, **BRORBY**, Senior Circuit Judge and
**TYMKOVICH**, Circuit Judge.

Plaintiff-appellant Mary D. Stokes appeals from an order of the district
court affirming the Commissioner's decision denying her application for Social
Security disability and Supplemental Security Income benefits. Ms. Stokes filed
for these benefits on May 16, 2003. She alleged disability since February 19,

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel. It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

2003, based on osteoarthritis, rheumatoid arthritis, diabetes, back pain, and depression. The agency denied her applications initially and on reconsideration.

On September 4, 2004, Ms. Stokes received a de novo hearing before an administrative law judge (ALJ). The ALJ subsequently determined that Ms. Stokes was not disabled.

> The Commissioner is required to follow a five-step sequential evaluation process to determine whether a claimant is disabled. The claimant bears the burden of establishing a prima facie case of disability at steps one through four. Step one requires the claimant to demonstrate that he is not presently engaged in substantial gainful activity. At step two, the claimant must show that he has a medically severe impairment or combination of impairments. At step three, if a claimant can show that the impairment is equivalent to a listed impairment, he is presumed to be disabled and entitled to benefits. If a claimant cannot meet a listing at step three, he continues to step four, which requires the claimant to show that the impairment or combination of impairments prevents him from performing his past work.

> If the claimant successfully meets this burden, the burden of proof shifts to the Commissioner at step five to show that the claimant retains sufficient . . . residual functional capacity . . . to perform work in the national economy, given her age, education, and work experience. If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary.

*Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citations and quotations omitted).

The ALJ found in Ms. Stokes' favor at steps one and two. At step three he found that Ms. Stokes' impairments did not meet or equal a listed impairment but he found at step four that Ms. Stokes' residual functional capacity (RFC) would not allow her to return to her past relevant work as a nurse's aide, sewing machine operator, or certified medical aide. The ALJ's RFC finding was:

> The claimant's impairments limit her to a wide range of light level work activity. Specifically, the claimant can lift and carry 20 pounds. She can stand and/or walk 6 hours in an 8-hour workday at 45 minute intervals and sit 6 hours in an 8-hour workday at 45 minute intervals. She can occasionally climb, bend, stoop, squat, kneel, crouch, crawl, reach overhead, push and pull, and operate foot controls. She is slightly limited in fingering, feeling[], and grasping. She requires an environment of low light, low noise and must avoid cold, damp, rough and uneven surfaces, unprotected heights, fast and dangerous machinery and night driving. She requires simple, repetitive, and routine work and is slightly limited in contact with public, coworkers and supervisors.

Aplt. App., Vol. 2 at 27. Nevertheless, the ALJ found at step five that with this RFC there were a significant number of other jobs Ms. Stokes could perform in the national or regional economy. He therefore concluded Ms. Stokes was not disabled within the meaning of the Social Security Act. The Appeals Council denied review, making the ALJ's decision the Commissioner's final decision.

Ms. Stokes appeals. Her main arguments are that the ALJ erred at steps two, three, and five of the evaluation process and that he failed to perform a proper credibility determination. We have jurisdiction under 28 U.S.C. § 1291 and 42 U.S.C. § 405(g). We review the Commissioner's decision to determine

whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. *See Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fowler v. Bowen*, 876 F.2d 1451, 1453 (10th Cir. 1989) (quotations omitted). Following such review, we AFFIRM.

I.

Ms. Stokes' first point alleges the ALJ erred by failing to consider her pain disorder at step two of the sequential evaluation process. "At step two, the claimant must show that [she] has a medically severe impairment or combination of impairments." *Lax*, 489 F.3d at 1084 (quotation omitted). The ALJ found Ms. Stokes had a medically severe impairment or combination of impairments, but did not reference Ms. Stokes' pain disorder when making that finding. That failure, by itself, does not constitute reversible error, *see Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987), because once the ALJ finds the claimant has a medically severe impairment or combination of impairments, he or she is required to "consider the limiting effects of *all* [the claimant's] impairment(s), even those that are not severe, in determining [the claimant's] residual functional capacity." 20 C.F.R. §§ 404.1545(e), 416.945(e) (emphasis added).

II.

Ms. Stokes claims the ALJ erred at step three as well.

> At step three, the determination is made whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. If the impairment is listed and thus conclusively presumed to be disabling, the claimant is entitled to benefits.

*Lax*, 489 F.3d at 1085 (citations, quotations, and brackets omitted).

Ms. Stokes claims the ALJ failed to utilize the "special technique" required by the regulations when evaluating her mental impairments at this step. Specifically, she argues the ALJ failed to make specific findings as to what rating he was assigning to her functional limitations in the areas of activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. We agree error occurred.

The ALJ's decision simply stated that he had "carefully compared [Ms. Stokes'] signs, symptoms, and laboratory findings with the criteria specified in all of the Listings of Impairments" and found that her impairments did not meet the criteria for any listed impairment. Aplt. App., Vol. 2 at 22. This is deficient when the claimant has mental impairments as well as physical impairments. Under the regulations, when evaluating mental impairments, the agency must follow a "special technique." 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the agency is required to rate the degree of a claimant's functional limitations caused by those impairments in the areas of "[a]ctivities of daily

-5-

living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ then applies those ratings in determining whether the claimant's mental impairments are severe at step two and, if so, whether these severe impairments "meet[] or [are] equivalent in severity to a listed mental disorder" at step three. *Id*. §§ 404.1520a(d)(1-2), 416.920a(d)(1-2). At the ALJ hearing level, "[t]he decision must include a specific finding as to the degree of limitation in each of [those] functional areas." *Id*. §§ 404.1520a(e)(2), 416.920a(e)(2).

The agency argues this error was harmless under our holding in *Fischer-Ross v. Barnhart*, 431 F.3d 729, 734 (10th Cir. 2005). In *Fischer-Ross*, as in this case, the ALJ summarily found that none of the listed impairments were met at step three. The court considered whether *Clifton v. Chater,* 79 F.3d 1007, 1009 (10th Cir. 1996) (holding that such a conclusory determination at step three was "beyond meaningful judicial review"), "require[d] reversal where the ALJ's factually substantiated findings at steps four and five of the evaluation process alleviate[d] *any* concern that [but for the error] a claimant might have been adjudged disabled at step three." *Fischer-Ross*, 431 F.3d at 730. The court held that *Clifton* required no such outcome, holding: "harmless error analysis 'nevertheless may be appropriate to supply a missing dispositive finding . . . where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the

-6-

correct analysis, could have resolved the factual matter in any other way.'" *Id*. at 733-34 (quoting *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004)) (alteration in original).

In the present case, Ms. Stokes was diagnosed with three mental impairments, anxiety, a depressive disorder, and a "[p]ain disorder associated with both psychological factors and a general medical condition," Aplt. App., Vol. 2 at 331.[1] At step three, these impairments are compared to the impairments listed at sections 12.04 (Affective Disorders),[2] 12.06 (Anxiety Related Disorders), and 12.07 (Somatoform Disorders),[3] of 20 C.F.R., pt. 404, subpt. P, App. 1 (Listed Impairments). Under the facts of this case, in order for the ALJ to have found that Ms. Stokes' mental limitations met the required level of severity for any of these listed limitations, the ALJ would have to have found that her limitations resulted in at least two of the following:

---

[1] Dr. John Hickman also diagnosed Ms. Stokes with a cognitive disorder not otherwise specified, but stated it was probably a secondary effect of her depression and pain. A cognitive disorder "is a clinically significant deficit in cognition or memory that represents a significant change from a previous level of functioning." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 123 (4th ed. 1994) (DSM-IV).

[2] An affective disorder is "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." 20 C.F.R., pt. 404, subpt. P, App. 1, § 12.04.

[3] A "pain disorder associated with both psychological factors and a general medical condition" is a type of somatoform disorder. DSM-IV at 458-62.

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration[.]

*See* Listed Impairments §§ 12.04(B); 12.06(B), and 12.07(B).[4] A "marked"

limitation

> means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis.

*Id.*, § 12.00(C).

A reasonable administrative factfinder *could* have determined Ms. Stokes

had marked difficulties in maintaining concentration, persistence, or pace.

"Concentration, persistence, or pace refers to the ability to sustain focused

attention and concentration sufficiently long to permit the timely and appropriate

completion of tasks commonly found in work settings." *Id.*, § 12.00(C)(3). The

ALJ's opinion referenced the determination in the consultative mental status

examination that Ms. Stokes had marked limitations in the ability to understand

---

[4]     Under certain conditions, paragraph B would not have to be met for a limitation to meet the required level of severity under sections 12.04 and 12.06 of the Listed Impairments. *See* Listed Impairments §§ 12.04(C); 12.06(C). Ms. Stokes does not argue those conditions were met in this case.

and remember detailed instructions, the ability to carry out detailed instructions, and the ability to sustain an ordinary routine without special supervision, and that she had a moderate limitation in the ability to complete a normal workday and workweek and to perform at a consistent pace without an unreasonable number and length of rest periods.  Further, in his RFC determination the ALJ limited Ms. Stokes to "simple, repetitive, and routine work,"  Aplt. App., Vol. 2 at 27.

Nevertheless, a reasonable factfinder could not have determined Ms. Stokes had a marked restriction of activities of daily living (ADLs), marked difficulties in maintaining social functioning, or repeated episodes of decompensation, each of extended duration.

As to repeated episodes of decompensation:

> Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.

Listed Impairments § 12.00(C)(4).  "The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."  *Id.*  Ms. Stokes argues the evidence of her one or two previous suicide attempts shows repeated episodes of decompensation.  In his disability evaluation, Dr. Hickman noted that Ms. Stokes reported two suicide attempts, Aplt. App., Vol. 2 at 328, that had occurred "a few years ago." *id*., at 329.  In her testimony

before the ALJ, Ms. Stokes testified that she had previously tried to end her life by overdosing on medication after being fired from her job. She did not specify exactly how many attempts she had made, simply saying "I had taken . . . a bunch of my pills." *Id*. at 403. She testified that she thought the attempts occurred in 2001, which would be prior to the claimed date of disability, but she could not remember the exact year. She presented no evidence of the type or quantity of medications she took and, although she testified she saw a psychiatrist after the attempts, she gave no specifics as to her treatment and provided no treatment records. No reasonable factfinder could have found the criteria of repeated episodes of decompensation to have been met from such cursory references to previous suicide attempts.

As to marked difficulties in maintaining social functioning, we note that "[s]ocial functioning refers to [a claimant's] capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." Listed Impairments § 12.00(C)(2). Ms. Stokes argues her "social functioning is at least markedly, if not extremely, limited." Aplt. Opening Br. at 26. The ALJ noted in his decision that Dr. Hickman's mental status examination (MSE) found only "3 levels of 'marked' functioning out of 20 and the rest were "moderate" or not a significant limitation." Aplt. App., Vol. 2 at 23. A review of the record shows Dr. Hickman found no limitations in the "social interaction" section of the MSE. Ms. Stokes does not specify what record evidence supports her claim that

her social functioning is, at the least, markedly limited, and our independent review has not revealed sufficient evidence to allow a reasonable factfinder to determine that the criteria for such a finding were met.

Finally, as to whether a reasonable factfinder could find Ms. Stokes had marked restrictions of ADLs, we note that "[a]ctivities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for [one's] grooming and hygiene, using telephones and directories, and using a post office." Listed Impairments § 12.00(C)(1). The ALJ found "[a]t the hearing the claimant testified that she is able to take care of her personal needs. She testified that she can perform household chores and does the cooking. The claimant testified that she is able to read, shop and watch television." Aplt. App., Vol. 2 at 24.

> Ms. Stokes argues:
>
> her ADLs are markedly limited. The ALJ cited Claimant's testimony about being able to care for her personal needs, perform household chores, cook, read, shop and watch television. He ignored that these are minimal ADLs, which are not substantial evidence that a claimant can work. He also ignored that the non-treating, non-examining, reviewing experts of the State agency stated that her ADLs were limited.

Aplt. Opening Br. at 25 (citations omitted).

As to Ms. Stokes' first argument, it is true that evidence showing the ability to perform minimal activities of daily living is not, by itself, substantial evidence

-11-

a claimant can work. "The sporadic performance of household tasks or work does not establish that a person is capable of engaging in substantial gainful activity." *Thompson v. Sullivan*, 987 F.2d 1482, 1489 (10th Cir. 1993). But the question at issue at this point in the review is simply whether a reasonable factfinder could conclude Ms. Stokes had marked restrictions of ADLs, not the overall question of whether she is disabled.

As to Ms. Stokes' second argument, we acknowledge that the "Consultant's Notes" section of a Psychiatric Review Technique (PRT) form in the record states "[h]er ADL[]s are limited by physical issues." Aplt. App., Vol. 2 at 148. But the consultant did not offer an opinion on what *level* of limitation existed. That section of the PRT form also states:

> ADL[]s indicate she is able to meet her own personal needs, sometimes, husband helps put on her shoes, she cooks several times a week, she vacuums, family does laundry, her daughter does the shopping for her, she reads, watches TV, her hobby is playing Bingo weekly, she visits about three times a week, she drives + is not active in groups.

*Id*. This recitation of her abilities is fairly consistent with Ms. Stokes' hearing testimony. At the hearing she testified she had no hobbies, she did not read anymore because of concentration problems, she did the laundry and her husband hung it on the clothesline for her, and she did the shopping but her daughter went along to lift the heavy items.

-12-

Consequently, while it is clear Ms. Stokes' ADLs are somewhat limited by her medical conditions, we conclude no reasonable factfinder could have found Ms. Stokes had *marked* restrictions of her ADLs and, therefore, that the ALJ's failure to properly utilize the "special technique" at step three was harmless error.

III.

In her third point on appeal, Ms. Stokes claims the ALJ erred at step five of the sequential evaluation. At step five, the Commissioner must "show that the claimant retains sufficient [RFC] to perform work in the national economy, given her age, education, and work experience." *Lax*, 489 F.3d at 1084.

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

Ms. Stokes argues that a person with her RFC could not perform the jobs of bench assembler, electrical assembler, clerical mailer, and assembler, which the ALJ found were representative of a significant number of jobs that Ms. Stokes could perform that were available in the national economy. Among other limitations incorporated in the RFC, the ALJ found that Ms. Stokes "requires an

environment of low light, low noise" and was limited to "simple, repetitive and routine work." Aplt. App., Vol. 2 at 27.

Ms. Stokes' first argument is that the ALJ's limitation to an environment of low noise should be construed as a limitation to jobs with a Department of Labor noise-intensity-level rating of two or less. Her second argument is that the ALJ's limitation to simple, repetitive, and routine work should be construed as a limitation to jobs with a Department of Labor reasoning-level rating of one.

With regard to the ALJ's limitation to low noise, we note the ALJ stated to the vocational expert (VE) in presenting his hypothetical:

> In limiting the low light and low noise, I'm not trying to restrict a routine ordinary business, commercial, educational type noise or light environment, but if she's going to be outside in bright sunlight all day flagging trucks by or on a foundry floor or working around bright photo plugs, I want to restrict that type of work activity.

*Id*. at 412, Aplt. App., Vol. 1 at 57-58. The Department of Labor ranks noise intensity as follows:

| 1 | Very Quiet | isolation booth for hearing test; deep sea diving; forest trail |
|---|---|---|
| 2 | Quiet | library; many private offices; funeral reception; golf course; art museum |
| 3 | Moderate | business office where typewriters are used; department store; grocery store; light traffic; fast food restaurant at off-hours |

| 4 | Loud | can manufacturing department; large earth-moving equipment; heavy traffic |
| 5 | Very Loud | rock concert - front row; jackhammer in operation; rocket engine testing area during test |

U.S. Dep't of Labor, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, App. D, D-2 (1993) (SCO). It appears to us that the ALJ intended to preclude jobs with a noise intensity level of four or five. The electrical assembler (DOT number 729.687-010) and clerical mailer (DOT number 209.587-010) both have noise intensity levels of three. *See* SCO at 284, 347. But the bench assembler (DOT number 780.684-062) and semiconductor assembler (DOT number 726.687-046) jobs have noise intensity levels of four.[5] *See* SCO at 302, 308. We believe the ALJ's reference to these level-four jobs was harmless.

Harmless error is seldom used to supply a missing dispositive finding in a situation such as this because this court must avoid "usurping the administrative tribunal's responsibility to find the fact" and must not "violate[]the general rule

---

[5] The VE specifically provided the court with the DOT numbers for the jobs he was considering. We have examined the jobs specified by those numbers. We note, however, that the official titles for the jobs the VE described "electrical assembler," "clerical mailer," "bench assembler," and "semiconductor assembler" are actually "assembler, electrical accessories I," "addressor," "fabricator, foam rubber," and "wafer breaker, semiconductors," respectively. *See* 1 U.S. Dep't of Labor, Dictionary of Occupational Titles 180 (4th ed., rev. 1991); 2 U.S. Dep't of Labor, Dictionary of Occupational Titles 736, 744, 810 (4th ed., rev. 1991).

against post hoc justification of administrative action." *Allen*, 357 F.3d at 1145. In *Allen*, we refused to find harmless error when the ALJ erroneously relied on testimony that there were eight hundred appropriate jobs available statewide when the record supported only a determination that one hundred appropriate jobs were available statewide. We recognized in *Allen*, however, that harmless error "might have been [appropriate] had the number of available jobs identified by the VE not been one hundred but considerably greater." *Id.* Further, as recognized in *Allen,* we had determined in the previous case of *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992), that an evidentiary showing of 650-900 statewide jobs was not sufficient to show that work existed in significant numbers in the region where the claimant lived as a matter of law, although we did affirm the ALJ's factual finding that significant numbers existed.

But the case at hand is different from both *Allen* and *Trimiar*. Here, the VE testified that 6,000 electronics assembler jobs existed regionally and 72,000 existed nationally and that 5,000 clerical mailer jobs existed regionally and 80,000 nationally. Thus, even if we consider only these two jobs out of the four considered by the ALJ, there were still 11,000 jobs available regionally and 152,000 jobs available nationally.[6] Here, we do not believe any reasonable

---

[6]    The VE testified he was "using Region Six of the Social Security Administration's regions." Aplt. App., Vol. 2 at 410. We note that the Social Security Administration is divided into ten different regions. Region six is also referred to as the "Dallas Region" and serves the states of Arkansas, Louisiana,

(continued...)

-16-

factfinder could have determined that suitable jobs did not exist in significant numbers in either the region where Ms. Stokes lives or several regions of the country.

Ms. Stokes' second argument is that the ALJ's limitation to simple, repetitive and routine work should be construed as a limitation to jobs with a reasoning-level rating of one. We disagree. All of the jobs considered by the ALJ had a reasoning level rating of two. In *Hackett v. Barnhart*, we held that a limitation "'for simple and routine work tasks'" was inconsistent with the demands of level-three reasoning but consistent with the demands of level-two reasoning, 395 F.3d 1168, 1176 (10th Cir. 2005), which under the DOT means that a claimant can "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions[ and d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." *See* 2 DOT, App. C, at 1011.

IV.

Ms. Stokes' main argument in her final point is that the ALJ failed to perform a proper credibility determination in part because he ignored her

---

[6](...continued)
New Mexico, Oklahoma, and Texas. *See* Dallas Region Home Page, http://www.socialsecurity.gov/dallas/ (last visited April 4, 2008), and Office of Disability Adjudication and Review, Dallas Region 6 Homepage, http://www.socialsecurity.gov/appeals/r6/dallas.html (last visited April 4, 2008).

somatoform disorder.  She claims the following credibility determination was erroneous:

> The claimant has alleged pain and that she cannot work because of these symptoms.  The credible medical evidence, however, does not establish an underlying medical condition so severe as to be productive of limitations that would preclude all work activity and the claimant's testimony is found credible only to the extent consistent with a residual functional capacity for a wide range of light work.

Aplt. App., Vol. 2 at 27.  Ms. Stokes claims that instead of properly determining her credibility, the ALJ determined her RFC and then tailored this credibility determination accordingly.

We initially note that this is not a case where the ALJ failed to give any consideration to Ms. Stokes' subjective complaints of pain.[7]  The decision states:

> [a]s to the claimant's allegations of totally disabling pain, her testimony was evaluated and compared with prior statements and other evidence.  It is the conclusion of the [ALJ] that the pain

---

[7]    When a claim of disabling pain has been made:

> We must consider (1) whether Claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a loose nexus between the proven impairment and the Claimant's subjective allegations of pain; and (3) if so, whether considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling.

*Kepler v. Chater*, 68 F.3d 387, 390 (10th Cir. 1995) (quotation omitted).  Here, objective physical and mental medical evidence showed pain-producing impairments and that a "loose nexus" existed between the impairments and Ms. Stokes' subjective allegations of pain.

-18-

experienced by the claimant is limiting but, when compared with the total evidence, not severe enough to preclude all types of work.

Aplt. App., Vol. 2 at 23. Ms. Stokes challenges the determination that her claim of *disabling* pain was not credible.

"Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Kepler*, 68 F.3d at 391 (quotation omitted). But "[i]t is well-established that an ALJ's findings with respect to a claimant's credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Hardman v. Barnhart*, 362 F.3d 676, 678-79 (10th Cir. 2004) (quotation omitted).

Ms. Stokes attacks the ALJ's credibility determination on a number of fronts. She disputes certain findings or statements the ALJ made in determining her claim was not credible. These include: (1) her diabetes treatment was routine and conservative in nature; (2) her back injury treatment was conservative; (3) Ms. Stokes had not sought mental health treatment on her own, and (4) she quit working because of her back pain, and not due to emotional problems.

She also claims the ALJ ignored certain pieces of favorable evidence from her medical records in finding her claim of disabling pain non credible. These include evidence that she demonstrated "absent ankle deep tendon reflexes," Aplt. Opening Br. at 37, numbness, "muscle weakness, an abnormal gait and toe

-19-

walking, sacroiliac joint tenderness, muscle spasm, and decreased and painful range of motion of the lumbar spine," *id.*, "bilateral arthritic changes in her ankles," *id.* at 38, and evidence that "following her surgery, Claimant developed another bulging disc, was prescribed a back brace, and found to have arthritic changes of her spine, as well as blood tests indicating rheumatoid arthritis," *id.* Finally, she claims the ALJ's credibility determination was flawed because he gave her no credit for her work history after her 1997 back surgery, in that a good work history enhances credibility.

The only question this court must answer is whether the ALJ's determination that Ms. Stokes' allegations of disabling pain were not credible was closely and affirmatively linked to evidence that a reasonable mind might accept as adequate to support that conclusion. As properly stated by the magistrate judge in the district court: "The ALJ accurately summarized the record and explained his reasons for discounting claimant's pain allegations, including Plaintiff's own testimony about her activities, relatively moderate symptoms reflected in the medical record, functional range of motion, and no functional limitations placed on her activity by any treating physician." Aplt. App., Vol. 1 at 59. A review of the record shows the ALJ incorporated most of Ms. Stokes' hearing testimony regarding her limitations into his RFC finding. Although Ms. Stokes argues that one of her treating physicians did, in fact, place a functional limitation on her activity by way of an opinion that she could not work, this opinion, as will be

discussed in detail below, was cursory, conclusory, and unsupported by the record. Thus we see no reason to overturn the ALJ's credibility determination in this case.

Ms. Stokes also raises arguments in her last point separate from her challenge to the ALJ's credibility finding. Ms. Stokes claims that "[t]he ALJ found Claimant's ADLs compatible with light work. He never explained how he reached this conclusion. He merely implied that she took care of her personal needs, performed household chores, cooked, read, shopped and watched television on a full time basis." Aplt. Opening Br. at 40. This argument misrepresents the content of the ALJ's decision. The determination that Ms. Stokes could perform a wide range of light level work activity was based on the ALJ's RFC determination which, in turn, was based on the evidence in the record, including Ms. Stokes' own testimony regarding her limitations. The RFC determination was not based solely on her ability to perform ADLs.

Ms. Stokes claims the ALJ's RFC determination was flawed because "he failed to include any limitations with regard to foot controls, and he acknowledged only a 'slight' limitation of fingering, feeling, and grasping." Aplt. Opening Br. at 37. The ALJ's decision properly described the physical consultative examination as indicating that "the claimant's feet and hands for repetitive movement would be limited bilaterally." Aplt. App., Vol. 2 at 23.

Ms. Stokes argues that "[r]epetitive use implies more that 'slight' use."  Aplt. Opening Br. at 37.

First, we note that the ALJ did not limit Ms. Stokes' fingering, feeling, and grasping to "slight use."  The RFC determination found Ms. Stokes could reach overhead, push and pull, and operate foot controls "occasionally," and that "[s]he is slightly limited in fingering, feeling[], and grasping."  Aplt. App., Vol. 2 at 27. Nevertheless, when the VE was asked whether the jobs he had found Ms. Stokes could perform "require[d] constant or repetitive use of the hands," he testified: "Yes, frequent to constant."  *Id*. at 415.  The physical consultative examination simply stated that Ms. Stokes' ability for repetitive grasping and fingering was limited.  The examination report noted she had functional range of motion in her wrist and fingers but that she had tingling numbness and pain in her legs and hands, "with findings consistent with peripheral neuropathy, probably the result of her longstanding diabetes mellitus."[8]  Aplt. App., Vol. 2 at 338.

At the hearing Ms. Stokes was asked to describe the problems she was having with her hands and wrists.  The ALJ asked her if she was having any problems with neuropathy in her hands and fingers.  She testified she had

---

[8]     Peripheral neuropathies related to diabetes mellitus "can cause a bilaterally symmetric hypesthesia [loss of sensitivity], hyperesthesia [hyper-sensitivity], paresthesia [abnormal sensitivity–prickling, tickling, or tingling], loss of temperature and vibratory sense, or causalgia [persistent severe burning pain]." *See Stedman's Medical Dictionary* 1212 (27th ed. 2000) (description of diabetic neuropathy).

arthritis, that sometimes when she got out of bed her hands were stiff and she could not hold things, and that sometimes the condition wore off as the day progressed. But she testified she had no neuropathy in her hands and fingers. She testified she could pick dimes off a table with both hands, that she could not change a light bulb over her head because she could not keep a hold on the light bulb, but that she could comb and wash her hair, and she had no trouble operating the steering wheel, gear selector, or turn signal when she drove. She also testified she could lift an iron skillet or a gallon of milk, although she sometimes had to use two hands for the skillet.

The ALJ, in a colloquy with the VE on the issue of Ms. Stokes' slight limitation on fingering, feeling, and grasping, stated "I'm not saying she can't work with her hands and fingers, but she shouldn't be doing small, tedious things with her hands and fingers. She could put her kid's bicycle together maybe but she might not be able to work with her kid's erector set." Aplt. App., Vol. 2 at 412. Considering Ms. Stokes' own testimony that the problem she was experiencing with her hands was stiffness from arthritis and the ALJ's explanation to the VE that he did not want her doing small, tedious things with her hands and fingers, we hold that the RFC's limitations that she only operate foot controls "occasionally," and that "[s]he is slightly limited in fingering, feeling[], and grasping," are supported by substantial evidence.

-23-

Ms. Stokes also claims the ALJ failed to properly consider the medical opinion of one of her treating physicians. That physician, Dr. Steve Sanders from the Pawnee Indian Health Clinic, provided a one-sentence opinion stating "Mary Stokes suffers from chronic low back [sic] and would not be able to work full time on a regular basis." *Id*. at 308. Ms. Stokes' attorney informed the ALJ that the clinic was not cooperative with such requests, that "[w]e get what we can," and that he had "to dance a little trick" to get anything at all. Aplt. App., Vol. 2 at 379. In his decision, the ALJ found that Dr. Sanders' opinion could not "be given controlling weight because it is brief and conclusory with nothing in the way of clinical findings to support his conclusion." *Id*. at 25.

Citing *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995), Ms. Stokes argues the ALJ should have gone on to determine *what* weight he was giving the opinion. No error was made because this is not a medical opinion. The "opinion" merely opines that Ms. Stokes suffers from "chronic low back." Aplt. App., Vol. 2 at 308. It was undisputed that Ms. Stokes has *some* degree of back injury and pain. The doctor's subsequent legal conclusion that this "chronic low back" rendered Ms. Stokes totally disabled is a determination reserved for the Commissioner. 20 CFR §§ 404.1527(e), 416.927(e).

Ms. Stokes also argues the ALJ had a duty to re-contact Dr. Sanders to obtain a detailed opinion. The applicable regulations state:

> We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. We may do this *by requesting copies of your medical source's records*, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source.

20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1) (emphasis added). But "it is not the rejection of the treating physician's opinion that triggers the duty to recontact the physician; rather it is the inadequacy of the evidence the ALJ receives from the claimant's treating physician that triggers the duty." *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2001) (quotations omitted). Here, the administrative record contains the medical records from the Pawnee Indian Health Clinic. Further, Dr. Sanders was not the only treating physician and the records from the other treating physicians are contained in the record as well. Thus, the ALJ did not err in failing to recontact Dr. Sanders.

Finally, Ms. Stokes claims that although the ALJ was aware she was on medication, he "failed to consider [her] medication and side effects with any significant degree of accuracy." Aplt. Opening Br. at 41. In support for this one-sentence argument, Ms. Stokes cites to a district court case and federal regulations which merely stand for the proposition that when considering subjective complaints of pain the ALJ should consider, among other things, the effects of the claimant's medications. Ms. Stokes' testimony as to her limitations

would clearly have taken into account the effects of her medications, as would the various objective tests in the record. Ms. Stokes' counsel made no argument at the administrative hearing regarding any extraordinary effects of her medications and her appellate brief does not specify what effects the ALJ failed to properly consider.

Finally, Ms. Stokes argues that the hypothetical the ALJ presented to the VE was incomplete. She argues the hypothetical was deficient because it insufficiently considered Dr. Hickman's finding in the post-hearing MSE that Ms. Stokes was markedly limited in her ability to sustain an ordinary routine without special supervision. Ms. Stokes failed to raise this argument with the district court. We do not ordinarily address arguments not first raised in the district court. *Crow v. Shalala*, 40 F.3d 323, 324 (10th Cir. 1994) ("Absent compelling reasons, we do not consider arguments that were not presented to the district court."). Here, Ms. Stokes argues that this is purely a legal argument and it is not intended to surprise the Commissioner and should be considered despite the failure to present it to the district court. But not only was this issue not raised in the district court, it was not raised in Ms. Stokes' opening brief. An appellant must raise all issues and arguments to be reviewed in their opening brief. *See* Fed. R. App. P. 28 (a)(5) & (9)(A). An issue or argument insufficiently raised in the opening brief is deemed waived. *Becker v. Kroll*, 494 F.3d 904, 913 n.6 (10th Cir. 2007).

## V.

The judgment of the district court is AFFIRMED.

Entered for the Court


Wade Brorby
Senior Circuit Judge